CHAMPALE, INC., Appellant,

v.

JOSEPH S. PICKETT & SONS, INC., and G. Heileman Brewing Company, Inc., Appellees.

No. 80–2102.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1981.

Decided Feb. 22, 1982.

James Van Santen (argued), Kathryn C. Grogman, Chicago, Ill., for defendant-appellee, G. Heileman Brewing Co., Inc.; Hill, Van Santen, Steadman, Chiara & Simpson, Chicago, Ill., of counsel.

Arthur A. March (argued), New York City, Richard C. Garberson, Shuttleworth & Ingersoll, Cedar Rapids, Iowa, for plaintiff-appellant.

John J. Byrne (argued), Charles L. Gholz, Bradford E. Kile, Baker & McKenzie, Washington, D. C., Robert M. Bertsch, O'Conner, Thomas, Wright, Hammer, Bertsch & Norby, Dubuque, Iowa, for appellee, Joseph S. Pickett & Sons, Inc.

Before LAY and McMILLIAN, Circuit Judges, and COLLINSON, Senior District Judge.[*]

COLLINSON, Senior District Judge.

The plaintiff appeals from adverse judgments for both defendants. After a non-jury trial, the trial court[1] in a memorandum opinion found for both defendants on all issues and judgments were entered accordingly.

Plaintiff is a brewer which markets a product labeled "Champale Malt Liquor." The word "Champale" is a registered trademark owned by Champale, Inc.

The defendant Heileman Brewing Co., Inc. is a brewer which became the licensee of the registered trademark "Champagne Velvet."

The defendant Joseph S. Pickett & Sons, Inc. is a brewer which acquired, by assignment from Heileman, the licensee rights to the trademark "Champagne Velvet," under a royalty agreement, and has marketed a product labeled "Champagne Velvet Malt Beverage."

HISTORY

In 1935 the Terre Haute Brewing Company started marketing beer labeled "Champagne Velvet." The beer became quite well known and accepted in certain markets.

In 1939 Metropolis Brewery of U. S., Inc. began marketing "Champale Malt Liquor." This brand became well known and accepted, and at some later date the trademark Champale was registered and owned by Metropolis.

In 1940, Terre Haute Brewing registered in its name the trademark "Champagne Velvet." At some later unspecified date, but before 1964, Atlantic Brewing Company became the owner of the "Champagne Velvet" trademark.

In 1964, at a time when Atlantic owned the Champagne Velvet mark, Atlantic was marketing a product labeled "Champetite Malt Liquor." Metropolis brought a suit against Atlantic for infringement of its trademark "Champale Malt Liquor." This suit was settled by written stipulation that Atlantic would discontinue all use of the trademark Champetite, but any new trademark adopted by Atlantic "in lieu of Champetite" (and therefore for malt liquor) could

> . . . use the word Champagne as one word of a plural word trademark, such as, but not limited to, Champagne Velvet . . .

Atlantic did not use the trademark Champagne Velvet on its malt liquor, but licensed Associated Brewing Company to use the Champagne Velvet trademark for a term of years (until December 31, 1985).

At some time before 1971, the plaintiff Champale, Inc. became the successor of Metropolis, the owner of the Champale trademark, and the brewer and seller of "Champale Malt Liquor." In 1971, Associated commenced the sale of "Champagne Velvet

[*] The Honorable William R. Collinson, Senior District Judge, Eastern and Western Districts of Missouri, sitting by designation.

[1] The Honorable Edward J. McManus, Chief Judge, United States District Court for the Northern District of Iowa.

Malt Liquor" and in the same year, Champale, Inc. sued Associated for trademark infringement and unfair competition.

During the pendency of this suit, defendant G. Heileman Brewing Company purchased certain assets of Associated including the licensee rights to the Champagne Velvet trademark. About one year after this purchase, a settlement of the Champale—Associated case was negotiated. Although not a party to that suit, Heileman was involved in this settlement because of its acquisition of the Champagne Velvet trademark. As part of the settlement Heileman signed an agreement with Champale which provided, in pertinent part:

> The G. Heileman Brewing Company agrees that it, its successors, assigns and licensees, will not use the trademark *Champagne Velvet* in connection with Malt Liquor and Ale.

The above agreement was dated July 10, 1973. On September 30, 1974, Heileman sold all its rights, title and interest in a number of brand names, including Champagne Velvet to defendant Joseph S. Pickett & Sons, Inc. That contract specifies:

> On the Closing Date (as subsequently defined) Heileman will sell, transfer, assign, convey and deliver to Pickett and Pickett will accept, all Heileman's rights, title and interest in the following brand names: Champagne Velvet Beer, Regal, Barbarossa, Tavern Pale, Red Top, 20 Grand and Nectar (herein called "Atlantic Brands"). Heileman is presently the exclusive licensee of the Atlantic Brands for a period ending December 31, 1985. Such rights, title and interest includes all formulaes and manufacturing processes in possession of Heileman relating to the brewing, packaging and storage of Atlantic Brands and the right to negotiate with the licensor of the Atlantic Brands to become a licensee on January 1, 1986.

From 1974 to 1977 Pickett sold Champagne Velvet beer. In approximately 1977 Pickett had been working on a formula for "winey" or "fruity" tasting malt beverage containing 5% alcohol and obtained a certificate of approval from the Bureau of Alcohol, Tobacco and Firearms for the label "Champagne Velvet Malt Liquor."

When Pickett commenced to negotiate for the distribution of his new product, a question was raised about the language in the Heileman-Pickett agreement and, upon advice of counsel, Mr. Pickett went to the home office of Heileman. Here he was told he could not use the label Champagne Velvet Malt Liquor and shown the 1973 Heileman-Champale agreement.

Pickett then "reformulated" the product, secured new labels for Champagne Velvet Malt Beverage, and commenced selling that product in December of 1977 or January of 1978.

On February 8, 1978, Champale filed this action naming Pickett as sole defendant. The complaint, in separate counts, charged (1) breach of the Heileman-Champale Agreement (2) Tortious Interference with the Heileman-Champale agreement, (3) Trademark Infringement, (4) False Description and Representation, and (5) Unfair Competition. Plaintiff prayed for an injunction and damages.

On May 18, 1978, the plaintiff filed an amended and substituted complaint naming Heileman as an additional defendant and asserting two causes of action against it, namely (1) Breach of the Heileman-Champale Agreement by permitting and allowing Pickett to sell Champagne Velvet Malt Liquor, and (2) Trademark Infringement by permitting Pickett to infringe the trademark.

Heileman moved for a summary judgment and the Court granted the motion, entering a summary judgment for Heileman on both causes of action alleged against it. This judgment was appealed, and this Court reversed the summary judgment on the breach of contract claim, holding that the contract was ambiguous because "it is reasonably susceptible of more than one construction." The case was remanded "for a ventilation of the circumstances surrounding the making of the contract in a plenary hearing so that the district court may determine the appropriate

construction of the contract clause here in question." *Champale, Inc. v. Joseph S. Pickett and Sons, Inc.*, 599 F.2d 857 (8th Cir. 1979).

Meanwhile, in January 1979, Pickett purchased all right, title and interest in the trademark Champagne Velvet from Lederer Industries, successor to Atlantic. In this transaction Lederer assigned all its right under the 1965 agreement between Atlantic and Metropolis (Champale's predecessor). It should be noted that the 1965 agreement provided:

> This agreement shall inure to the benefit of and be binding upon the parties, their successors and assigns.

In February 1979, Pickett and Heileman entered into an agreement whereby Pickett's rights to Champagne Velvet under the license were terminated and Heileman approved of the January 29, 1979, agreement between Lederer and Pickett.

In August 1979, Pickett assigned all its rights to Champagne Velvet to Pabst Brewing Co., and in December of that year Pabst began selling Champagne Velvet Malt Liquor.

 Champale's first cause of action (breach of contract) against Pickett is based on the theory that the Champale/Heileman agreement is binding on Pickett. This brief, cryptic agreement[2] is ambiguous in many respects, and there are serious questions as to the binding effect of the obligations thereunder not expressly assumed by the assignee of the trademark. But it is unnecessary to discuss these questions because this Court affirms the trial court's finding that Pickett's use of the label "Champagne Velvet Malt Beverage" does not constitute a violation of any agreement not to use the trademark "in connection with Malt Liquor."

The evidence on this point disclosed that the Federal Alcohol Administration Act (27 U.S.C. § 211(7)) contains the following definition:

> The term "malt beverage" means a beverage made by the alcoholic fermentation of an infusion or decoction, or combination of both, in potable brewing water, of malted barley with hops, or their parts, or their products, and with or without other malted cereals, and with or without the addition of unmalted or prepared cereals, other carbohydrates or products prepared therefrom, and with or without the addition of carbon dioxide, and with or without other wholesome products suitable for human food consumption.

The term "beer" is defined by 27 CFR 245.5 as follows:

> "Beer" shall mean beer, ale, porter, stout and other similar fermented beverages (including sake or similar products) of any name or description containing one-half of 1 percent or more of alcohol by volume, brewed or produced from malt, wholly or in part, or from any substitute therefor.

None of the statutory acts or regulations mention or define the term malt liquor.

The evidence further showed that most American beer contains less than 4% alcohol, averaging about 3.75%; that in the thirties several brewers introduced beer of higher alcoholic content, but since federal regulations regulate the stating on labels or in advertising the alcoholic content of beer, there was no way to promote or identify these brands as having a higher alcoholic content.

After World War II, the term "malt liquor" was coined and highly advertised to connote that it was much stronger than

---

2. NOW THEREFORE, for and in consideration of the promises and covenants herein contained, the parties have agreed as follows:

1. The G. HEILEMAN BREWING COMPANY agrees that it, its successors, assigns, and licensees, will not use the Trademark CHAMPAGNE VELVET in connection with Malt Liquor and Ale.

2. CHAMPALE, INC. agrees that G. HEILEMAN BREWING COMPANY, its successors, assigns and licensees, may use and continue to use the Trademark CHAMPAGNE VELVET in connection with Beer.

beer.[3] Actually it contains a maximum of 5% alcohol as contrasted with a maximum of 4% in beer. But, because of many varying state laws, much "malt liquor" contains less than 4% alcohol, and in some states only 3.2% alcohol. Plaintiff's own product, Champale Malt Liquor, is sold in many states with an alcoholic content no higher than that of beer sold therein.

Nor can malt liquor be defined by taste. Some have a distinct beer taste and some, like Champale, have a "winey" or "fruity" taste. Actually none of the plaintiff's witnesses could state any distinction between products labeled malt liquor and any other malt beverage except the public image, created by advertising, that it contains more alcohol than products labeled beer. Obviously, in the brewing industry, a malt liquor is any product which its brewer chooses to label malt liquor. Since Pickett did not label its product "malt liquor" it did not "use the trademark Champagne Velvet in connection with Malt Liquor." Neither did it use it in connection with ale.

The remaining causes of action stated against Pickett are, first, for tortious interference with the contract between Heileman and plaintiff. Since Pickett did not breach the terms of the contract, plaintiff has no ground for recovery on this claim. The remaining three causes of action for trademark infringement, false descriptions and representations, and unfair competition are all based on allegations that Pickett falsely simulated the trade dress and style of plaintiff's product which misled the public into believing defendant's product was produced by or has some association with plaintiff.

The trial court viewed the exhibits offered to support those allegations and found that "... use of the trademark CHAMPAGNE VELVET in connection with a malt beverage is not likely to cause confusion, mistake, or deception in relation to plaintiff's registered trademarks CHAMPALE and CHAMP."

We have viewed the exhibits offered and find no error in the trial court's findings.

The trial court also heard the evidence to "ventilate" the circumstances surrounding the making of the contract between Heileman and Champale, which Champale claimed Heileman had breached. This evidence, from plaintiff's own witnesses, fully substantiated the finding of the trial court that "Heileman had no duty, upon assignment, to police the action of the assignee." Plaintiff's Executive Vice President and Chief Operating Officer testified that he understood the contract to only require that Heileman would "see to it" that any assignee of the trademark was "informed" that it should not be used in connection with malt liquor or ale.

Regardless of when Pickett was notified of this restriction (the evidence is in dispute) there is no question that Pickett was fully informed of this provision in the fall of 1977, and as a result never used the trademark on a product labeled either malt liquor or ale.

The judgment of the trial court is affirmed in all respects.

---

3. We have all seen the television commercial depicting the enormous bull crashing through the wall when a certain brand of malt liquor is served.